UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MICHAEL McCRAY,                                                  :

               Petitioner,                      : 10 Civ. 5138 (RJS) (GWG)

   -v.-                                                          : REPORT AND RECOMMENDATION

JAMES CONWAY,                                                    :

               Respondent.                      :

----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Michael McCray, proceeding pro se, brings this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 following his conviction in state court of rape in the first degree, assault in the first degree, and two counts of criminal sexual act in the first degree. For the reasons stated below, his petition should be denied.

I.    BACKGROUND

    A.    Trial and Sentencing

      The following is a summary of the relevant evidence presented at trial.

      1.    People's Case:

      In May or June of 2002, McCray met L.L.[1] through a mutual friend. (L.L.: Tr. 40).[2] L.L. and McCray became friends. (L.L.: Tr. 40-41). L.L. knew McCray only by his nickname "Kno-Kno." (L.L.: Tr. 40-41). While McCray wanted their relationship to become more serious, L.L. told McCray that she did not "see him in that way." (L.L.: Tr. 44-45). L.L. never had

---

    [1] To protect the victim's identity, we refer to her by her initials.

    [2] "Tr." refers to the transcript of the trial, which is bound into two volumes. Pages 18-133 of the trial transcript are contained in Volume I (Docket # 6). Pages 134-456 are contained in Volume II (Docket # 7). "Sentencing Tr." refers to the transcript of the sentencing, which follows the trial transcript in Volume II.

consensual sex with McCray. (L.L.: Tr. 97). She believed that McCray thought she was a "tease." (L.L.: Tr. 45-46). In June 2002, L.L. and McCray saw each other regularly. (See L.L.: Tr. 42). McCray would visit L.L. at her apartment, where they would cook and package crack cocaine for sale with her stepfather. (L.L.: Tr. 43-44).

In the early morning of September 22, 2002, McCray and his brother came over to L.L.'s apartment. (L.L.: Tr. 46-48). They were "very intoxicated" when they arrived, "smell[ed] like beer and liquor" (L.L.: Tr. 47-48) and were carrying three 22-ounce bottles of beer (L.L.: Tr. 47-48). At the time, L.L's son was sleeping in the apartment's master bedroom. (L.L.: Tr. 51, 53). L.L. asked McCray if she could have $10 to buy a "dime bag of cocaine." (L.L.: Tr. 51-52). McCray agreed to lend her the money, provided she agreed "to give [him] something" in return. (L.L.: Tr. 52). L.L. responded "whatever." (L.L.: Tr. 52). She testified that she knew McCray "had expectations at that time," but that she was not worried "because [she] didn't see him as that type of person . . . ." (L.L.: Tr. 52). L.L. and McCray left together to purchase cocaine. (L.L.: Tr. 53-55).

After L.L. purchased the cocaine, they returned to L.L.'s apartment. (L.L.: Tr. 56-57). L.L. went to the bathroom to sniff cocaine, while McCray went into the unoccupied bedroom and demanded that she "bring [her] fuckin' ass" into the room. (L.L.: Tr. 58). She went into the bedroom and sat down next to McCray on the bed. (See L.L.: Tr. 58-59). He told her to "stop fuckin' playing with [him]" and then proceeded to choke her. (L.L.: Tr. 59). L.L. tried to get away, but she lost consciousness and passed out "going to the floor face down." (L.L.: Tr. 59). She testified that when she awoke, McCray "still had his hands around [her] throat" and she had urinated on herself. (L.L.: Tr. 59). McCray demanded that L.L. take her clothes off. (L.L.: Tr. 60). She removed her clothes and McCray climbed on top of her. (See L.L.: Tr. 62). After he

2

was unable to penetrate her vagina, McCray told L.L. to "turn around." (L.L.: Tr. 62). McCray then proceeded to anally sodomize L.L. (L.L.: Tr. 62-63). McCray then demanded that she perform "oral sex on him." (L.L.: Tr. 63). L.L. asked if she could first get a rag and McCray said "hell fuckin' no." (L.L.: Tr. 63). L.L. performed fellatio on McCray while "crying, crying, crying." (L.L.: Tr. 63). While she did this, McCray held his "pocket knife towards [her] neck" and threatened her family. (L.L.: Tr. 63). After a few minutes, McCray demanded that L.L. lay back on her stomach. (L.L.: Tr. 64). He then proceeded to penetrate her vaginally. (L.L.: Tr. 66). McCray eventually ejaculated inside of her and then he began to cry, "saying, 'I don't be doing this. I don't be doing this.'" (L.L.: Tr. 67-68).

L.L. left the second bedroom and went to the master bedroom. (L.L.: Tr. 67-68). She woke up her son and told him to call her stepfather. (L.L.: Tr. 68). L.L. locked the bedroom door. (L.L.: Tr. 68-69). McCray woke up his brother and the two left the apartment. (See L.L.: Tr. 69). Before they left, L.L. shouted to McCray's brother that McCray had raped her. (L.L.: Tr. 69). L.L. was unable to reach her stepfather and called 911. (L.L.: Tr. 74). Sometime thereafter, Police Officer Jonnette Ward and her partner arrived at L.L.'s apartment. (See Ward: Tr. 118-20). L.L. recounted the events to the officers. (Ward: Tr. 120-21). Officer Ward observed that L.L. had red marks on her neck, dots under her eyes, and that the "white of her eyes [began] to pool with blood." (Ward: Tr. 121).

    2.  McCray's Case

McCray testified that he had been convicted of attempted criminal possession of a weapon in 1991, a misdemeanor in 1996, and for "selling controlled substances" more than once. (McCray: Tr. 220). McCray is 5'5" tall and at the time of trial weighed 147 pounds. (McCray:

3

Tr. 278). He testified that he made his living by selling marijuana, cocaine, and crack cocaine. (McCray: Tr. 219-20, 221-22).

McCray and L.L were friends, and he also "suppl[ied] her drug habit and help[ed] her support her child . . . ." (McCray: Tr. 220-21). Prior to the incident, he and L.L. had had sex and he had stayed over at L.L.'s apartment "six, [or] seven times." (McCray: Tr. 223-24). McCray would sometimes give L.L. drugs or money in exchange for sex. (McCray: Tr. 225). He stated that L.L. was a "violent person" and that on one occasion she had thrown a beer bottle at him. (McCray: Tr. 226, 241).

On the night of September 21, 2002, McCray received a call from L.L. asking him to come over to her apartment. (McCray: Tr. 231-32). McCray at first refused, but L.L. persisted. (McCray: Tr. 231-33). McCray went over to L.L's apartment accompanied by his friend Kobie. (McCray: Tr. 231-33). McCray was "intoxicated" when he arrived at L.L.'s apartment and had consumed two to three bottles of liquor prior to his arrival. (McCray: Tr. 236). Nonetheless, he was able to remember what had occurred that night despite the fact that he had been intoxicated. (See McCray: Tr. 272-74.). Also, his "brain was [not] so fogged by alcohol or . . . drugs . . . that [he] didn't know what was going on." (McCray: Tr. 274). McCray and Kobie arrived at L.L.'s apartment and each drank one beer. (McCray: Tr. 237, 274-75). L.L. and Kobie also smoked marijuana. (McCray: Tr. 237, 274-75). McCray then accompanied L.L. to a nearby apartment building where he gave her $10, which McCray believed she used to pay off a debt. (McCray: Tr. 238).

When they returned to L.L.'s apartment, McCray offered L.L. money in exchange for sex. (McCray: Tr. 239). She agreed but asked McCray to wear a condom. (McCray: Tr. 243-44, 296). McCray refused but told L.L. that he "wasn't going to ejaculate in[side] her."

4

(McCray: Tr. 243-44, 277). McCray and L.L. then proceeded to engage in oral sex, and either vaginal or anal intercourse. (McCray: Tr. 240, 243, 276). Eventually, McCray ejaculated inside of L.L. (McCray: Tr. 244, 277, 295). L.L. was "highly upset" by this. (McCray: Tr. 244, 277, 295).

L.L. asked McCray for her money, but McCray refused to give her anything. (McCray: Tr. 244, 282-83, 297). L.L. went to the kitchen where she grabbed a "butcher knife." (McCray: Tr. 244). She then came into the bedroom with the knife and demanded that McCray "give [her] fucking money." (McCray: Tr. 246). L.L. swung the knife at McCray and he caught a "flashback" of the knife, which led to his receiving stitches. (McCray: Tr. 246-47). McCray grabbed L.L. by her throat in self-defense and also tried to grab the knife. (McCray: Tr. 247). During this struggle, L.L. lost consciousness and fell to the floor. (McCray: Tr. 247-48). Eventually, L.L. got up and went into the room where her son was sleeping. (McCray: Tr. 248). McCray tried to apologize, but L.L. told him to "get the fuck out" of her apartment. (McCray: Tr. 248). McCray and Kobie left. (McCray: Tr. 248).[3]

### 3. Charge, Verdict, and Sentence

During the trial, McCray's counsel requested that the jury be charged as to the defense of justification and intoxication. The court agreed to give the justification charge. (Tr. 307). In making his argument as to the intoxication charge, McCray's counsel relied on L.L. and McCray's testimony concerning McCray's state of intoxication and the testimony that he had drunk two or three bottles of liquor prior to his arrival. (Scott: Tr. 307-20).

---

[3] At trial, McCray also called his roommate, Troy Jones, as a witness. (Jones: Tr. 326-50). Jones testified that on occasions prior to the incident, he had seen L.L. and McRay go into McRay's room with the door closed and that they were in their underwear. (Jones: Tr. 329).

5

The court denied the charge, ruling that the "facts and [McCray's] testimony itself belie[d] the claim that he was intoxicated." (Tr. 319). In support of its decision, the court relied on McCray's detailed testimony about what occurred that day, concluding that "[t]here's nothing about his behavior that indicated that he wasn't able to form an intent with respect to all the actions he took that day." (Tr. 319-20). The court noted that the defendant had testified he was intoxicated but found that "the testimony and the actions of the defendant after that indicate[d] that he certainly was not intoxicated." (Tr. 319).

McCray was convicted of both counts of criminal sexual act in the first degree, and one count each of rape in the first degree and assault in the first degree. (Tr. 450-54). Prior to sentencing, McCray filed a pro se motion to set aside the verdict based on ineffective assistance of counsel. (See Sentencing: Tr. 2-3). At sentencing, the judge denied McCray's motion orally. (Sentencing: Tr. 3). As to McCray's sentence, the court found that McCray was a "persistent violent felony offender within the meaning of 400.16 CPL and 70.10 of the Penal Law." (Sentencing: Tr. 8). The court sentenced McCray to "22 [years] to life to run concurrently on counts one, two, three and four, also to run concurrently with each other." (Sentencing: Tr. 14).

B.  State Court Appeals

McCray appealed his conviction to the Appellant Division, arguing that the trial court committed an error by failing to submit the defense of intoxication to the jury. See Brief for Defendant-Appellant New York Supreme Court Appellate Division – First Department (annexed as Ex. A to Ashlyn Dannelly Declaration in Opposition to the Petition for a Writ of Habeas Corpus ("Decl.")) ("Def. Ap. Brief"). McCray, who was represented by counsel, claimed that "the [trial] evidence of his intoxication was sufficient for a reasonable juror to entertain a doubt as to the intent element of both rape and sodomy in the first degree . . . ." Def. Ap. Brief at 15.

6

In support of his argument, McCray cited, inter alia, the Fifth and Fourteenth Amendments of the U.S. Constitution.

On November 20, 2008, the Appellate Division affirmed McCray's conviction. See People v. McCray, 56 A.D.3d 359 (1st Dep't 2008); Notice of Entry (annexed as Ex. C to Decl.). The court held that the trial court "properly denied defendant's request for an intoxication charge." See McCray, 56 A.D.3d at 359. The court explained that "[t]he evidence, viewed in the light most favorable to [the] defendant, was insufficient for a reasonable person to entertain a doubt as to the element of intent on the basis of intoxication." Id. (citations omitted). While the court recognized that there was evidence "of defendant's alcohol and marijuana consumption prior to the incident," it held that this evidence "did not support an inference that, at the actual time of the incident, defendant was so intoxicated as to be unable to form the requisite intent, especially since his overall course of conduct showed that he was behaving purposefully." Id. at 559-60 (citation and internal quotation marks omitted). In making this determination, the court relied on McCray's own testimony at trial that he was aware of his actions. Id. at 360. The court concluded that this testimony "completely negated any intoxication defense." Id.

On December 15, 2008, McCray's counsel sought leave to appeal to the New York Court of Appeals, raising the trial court's refusal to give the intoxication charge. See December 15 Letter to Hon. Judith S. Kaye (annexed as Ex. D to Decl.). The Court of Appeals denied leave to appeal on February 24, 2009. See Certificate Denying Leave (annexed as Ex. F to Decl.).

C. The Instant Petition

On June 3, 2010, the Pro Se Office received McCray's petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. See Petition Under 28 U.S.C. § 2254 for Writ of Habeas

Corpus by a Person in State Custody, filed June 3, 2010 (Docket # 2) ("Pet."). The petition is dated May 24, 2010, and is postmarked June 1, 2010.

In the petition, McCray alleges that his "right to a fair and impartial trial and his right to present a defense [were] compromised by the trial court's failure to instruct the jury on an intoxication defense when such was evident." Pet. ¶ 12(a). In support of his petition, McCray attached his brief from the appellate division. The respondent filed opposition papers. See Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus, filed Oct. 26, 2010 (Docket # 10) ("Op. Memo"); Decl.; Tr. McCray's reply was received on December 2, 2010. See Reply to Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Nov. 27, 2010. In their papers, the respondent concedes that McCray's petition was timely filed, Op. Memo at 14-15, and that McCray's claim is exhausted, Op. Memo at 15-16.

II.   APPLICABLE LAW

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in

8

its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Harrington v. Richter, — U.S. —, 2011 WL 148587, at *9 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary"); see also id. (section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

      A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable" – a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 2011 WL 148587, at *12. In other words, to demonstrate an

9

"unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id.

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.), cert. denied, 130 S. Ct. 739 (2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Brisco, 565 F.3d at 90 (court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (citation omitted). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision cannot be contrary to or an unreasonable application of clearly established federal law. See Knowles v. Mirzayance, 129 S. Ct. 1411, 1413 (2009) ("[I]t is not an unreasonable application of clearly established Federal

law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.").

III.  DISCUSSION

McCray argues that the trial court "erred in refusing to submit the defense of intoxication to the jury." See Def. Ap. Brief at 15-21; Pet. ¶¶ 8(d), 12. "In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)) (internal quotation marks omitted); accord Hoover v. Senkowski, 2003 WL 21313726, at *9 (E.D.N.Y. May 24, 2003) ("The adequacy of a jury charge is ordinarily a matter of state law."). Thus, "[w]here an error in a jury instruction is alleged, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Davis, 270 F.3d at 123 (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)) (internal quotation marks omitted). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." Middleton v. McNeil, 541 U.S. 433, 437 (2004) (citations and internal quotation marks omitted).

The Second Circuit has held that courts must undertake a three-step analysis before granting habeas relief to a petitioner challenging a state court's refusal to give a jury instruction.

11

See Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir. 2005).  Under Jackson, courts are to make the following inquiry: 1) Was the petitioner entitled to the charge under state law?; 2) If so, did the failure to give the instruction result in a denial of the petitioner's federal due process rights?; 3) "[I]f so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?"  Jackson, 404 F.3d at 621 (citing 28 U.S.C. § 2254); accord Manning v. Fischer, 2006 WL 3408575, at *5 (S.D.N.Y. Nov. 22, 2006).

The initial inquiry, then, is whether McCray was entitled to an intoxication charge under New York law.  In making this determination, the court's role "is not to interpret New York's law of [intoxication], but to determine whether the evidence was sufficient to warrant [an intoxication] charge under that law."  Jackson, 404 F.3d at 621-22 (quoting Davis, 270 F.3d at 123-24 n.4 (2d Cir. 2001)) (other citation and internal quotation marks omitted); Manning, 2006 WL 3408575, at *6.

Under New York law, "[i]ntoxication is not a defense to a criminal charge but may be offered by a defendant whenever it is relevant to negate an element of the crime charged."  People v. Harris, 98 N.Y.2d 452, 474 n.4 (2002) (citing N.Y. Penal Law § 15.25).  A criminal defendant is entitled to an intoxication charge if "there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis."  People v. Gaines, 83 N.Y.2d 925, 927 (1994) (citations omitted); People v. Perry, 61 N.Y.2d 846, 850 (1984); People v. Rodriguez, 76 N.Y.2d 918, 920-21 (1990).  When making this determination, a court must view the evidence in the "light most favorable to the defendant."  People v. Farnsworth, 65 N.Y.2d 734, 735 (1985).

"[E]vidence of intoxication, sufficient to warrant the instruction . . . , may include evidence that [the] defendant's mental capacity has been diminished by intoxicants," or

12

"evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect [the] defendant's ability to form the necessary criminal intent." Rodriguez, 76 N.Y.2d at 920. A defendant's bare assertion that he was intoxicated, however, is not sufficient to warrant a charge of intoxication. See Gaines, 83 N.Y.2d at 927. Furthermore, even if evidence was admitted at trial that showed that a defendant had ingested drugs or alcohol, New York courts have denied an intoxication charge where the defendant gave testimony or made statements to the police indicating that he was not in fact intoxicated. See, e.g., People v. Rios, 150 A.D.2d 620, 621 (2d Dep't 1989) ("[W]e find that although the defendant had been drinking beer and cherry brandy, and smoking either marihuana or 'angel dust', . . . there is no evidence whatsoever that he was intoxicated at the time or that his mental capacity was in any way diminished. The defendant himself testified that he knew what he was doing . . . ."); People v. Franco, 144 A.D.2d 581, 581 (2d Dep't 1988) ("[The defendant's] statements to police four days after the murder indicate he had a clear and vivid recollection of the events preceding and following the murder as well as the particulars of the stabbing itself for which he claimed he was justified."); People v. Silverio, 252 A.D.2d 358, 358 (1st Dep't 1998) (trial court properly refused defendant's request for an intoxication charge when defendant made "coherent" statements to police explaining his motives). New York courts have also denied an intoxication charge when the court's evaluation of the evidence, taken in the light most favorable to the defendant, shows that the "defendant's overall course of conduct showed that he was behaving purposefully." People v. Manning, 1 A.D.3d 241, 241 (1st Dep't 2003).

     Here, we cannot say that New York law required an intoxication charge inasmuch as McCray himself testified to a course of conduct that was inconsistent with intoxication. While both McCray and L.L. testified that McCray was intoxicated when he arrived at L.L.'s apartment

in the early morning of September 22, 2002 (see McCray: Tr. 236; L.L.: Tr. 47-48), McCray had a clear and vivid recollection of the events surrounding the crime.  McCray testified that he knew what he was doing, that he remembered the details of what had occurred that evening (see McCray: Tr. 272-74) and that the marijuana and alcohol he had consumed had not "fogged" his brain to the point "that he didn't know what was going on," (see McCray: Tr. 274).  Numerous cases have found that an intoxication charge is not warranted when the defendant does not offer specific testimony as to the effect of drugs or alcohol on his mental state.  See, e.g., People v. Hill, 255 A.D.2d 969, 969 (4th Dep't 1998) (affirming trial court's refusal to issue intoxication charge where defendant failed to offer any evidence, inter alia, as to "the physical effects, if any, that the consumption of alcohol may have had on defendant's behavior or mental state"); People v. Fink, 77 A.D.3d 677, 678 (2d Dep't 2010) (intoxication charge properly denied where defendant testified "that he was thinking clearly, was aware of what he was doing, and intended to steal the idling vehicle."); People v. Malaussena, 44 A.D.3d 349, 349 (1st Dep't 2007) ("While there was evidence of defendant's alcohol or cocaine consumption, there was no evidence that could raise a reasonable doubt as to whether his faculties were so impaired at the time of the crime that he could not have formed the requisite intent."); People v. Park, 12 A.D.3d 942, 943 (3d Dep't 2004) ("While there was evidence that defendant consumed alcoholic beverages prior to the assault there was no evidence that he exhibited signs of intoxication or that his intoxication had a specific impact . . . upon his behavior or mental state . . . .") (citations and internal quotation marks omitted); People v. Anderson, 4 A.D.3d 302, 302 (1st Dep't 2004) ("The evidence, when viewed most favorably to defendant, did not warrant an inference that defendant's alcohol consumption affected his ability to form the requisite intent.") (citation omitted).

In addition, McCray provided detailed testimony about his interactions with L.L. He described, among other things, where they sat when he first arrived (McCray: Tr. 237); statements made by L.L., which he quoted verbatim (e.g., McCray: Tr. 237); the denomination of the bill he had used to buy cigarettes (McCray: Tr. 238); who was standing in front of a building they left to visit (McCray: Tr. 238); statements he made to L.L. while outside (McCray: Tr. 238); how long he waited for her in the hallway of the building (McCray: Tr. 238); where Kobie was sitting when L.L. and McCray returned to L.L.'s apartment (McCray: Tr. 239); which room L.L. took McCray to upon their return (McCray: Tr. 239); their conversation inside this room (McCray: Tr. 239); the various positions they assumed while engaging in sexual activity (see McCray: Tr. 240, 243); their conversation regarding condom usage (see McCray: Tr. 243-44); and the details of the knife L.L. grabbed from the kitchen (see McCray: Tr. 244-45). McCray's own account of the incident provides overwhelming and uncontradicted evidence that McCray was aware of everything that was going on around him and thus supports the trial court's determination that McCray's mental capacity was not affected by the intoxicants he consumed.

Even if it could be said that the failure to give the instruction violated New York state law, there are no Supreme Court cases requiring that an intoxication charge be given to a jury in any circumstances, let alone the circumstances found here. To the contrary, the Supreme Court held in Montana v. Egelhoff, 518 U.S. 37 (1996), that a state's refusal to offer intoxication evidence at all to negate mens rea does not violate the Due Process Clause. In Egelhoff, the Supreme Court was called upon to determine whether a Montana law that prohibited juries from considering a defendant's intoxication "in determining the existence of a mental state that is an element of a [criminal] offense," id. at 40, violated the Due Process Clause. A majority of the

15

justices held that the law was permissible. See id. at 58-59 (Ginsburg, J., concurring). Inasmuch as the majority of justices in Egelhoff found that a state's refusal to allow an intoxication defense did not constitute a due process violation, it cannot be said that the Appellate Division's refusal to find a federal due process violation in this case "was so lacking in justification" that its refusal to so find constituted "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 2011 WL 148587, at *12; see also Cagle v. Branker, 520 F.3d 320, 328-29 (4th Cir. 2008) (rejecting, in light of Egelhoff, a habeas corpus due process challenge to a North Carolina law that limited the use of voluntary intoxication).

IV.     CONCLUSION

For the foregoing reasons, McCray's petition should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard J. Sullivan, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Sullivan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated:  January 28, 2011
        New York, New York

                                                                                       GABRIEL W. GORENSTEIN
                                                                                       United States Magistrate Judge

Copies sent to:

Michael McCray
#05-R-4153
Attica Correctional Facility
P.O. Box 149
Attica, NY 14011

Ashlyn Hope Dannelly
New York State Office of the Attorney General
120 Broadway
New York, NY 10271

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Michael McCray
#05-R-4153
Attica Correctional Facility
P.O. Box 149
Attica, NY 14011

Ashlyn Hope Dannelly
New York State Office of the Attorney General
120 Broadway
New York, NY 10271